# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7944 | **DATE** | 3/17/2003 |
| **CASE TITLE** | Databurst LLC vs. Checkfree Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. The accompanying Memorandum Opinion and Order is entered and addresses the claim construction issues [53-1] in this case.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAR 19 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | C3 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 03 MAR 18 PM 5:07 | date mailed notice | |
| MM | courtroom deputy's initials | 01 03-0371 Date/time received in central Clerk's Office | mailing deputy initials | |

| | | |
|---|---|---|
| DATABURST, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 00 C 7944 |
| v. | ) | |
| | ) | |
| CHECKFREE CORPORATION, | ) | Judge Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

MAR 19 2003

# MEMORANDUM OPINION AND ORDER

Plaintiff Databurst, LLC ("Databurst") has brought this patent infringement action against Checkfree Corporation ("Checkfree") alleging that Checkfree has infringed Databurst's United States Patent No. 5,007,084 ("'084 patent"). This opinion construes disputed claims of the '084 patent to determine their scope and meaning. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Each party has submitted its respective position on claim construction, enabling the court to address the disputed claim elements as a matter of law.

**Patent '084**

The '084 patent covers a bill payment system for sending, receiving and authorizing payment of bills that consists of three general components. According to Checkfree, the '084 patent relates to a "system for broadcasted billing information and allowing a user to pay a bill." (Checkfree Mot. at 3.) Checkfree describes the system as containing three components: (1) broadcast equipment that prepares and broadcasts billing information; (2) a Payment Authorization and Information Device ("PAID") at a user's location; and (3) an Information Center that receives and processes payment instructions from a user. Under the system as described by Checkfree, a supplier (such as a credit

63

card issuer) generates bill data for its customers and broadcast equipment (the first component) reads the bill data and "pushes" it out to all users. Checkfree describes the information as "pushed" (not pulled) because the user does nothing to retrieve the data. According to Checkfree, the user has a special device called a PAID (the second component) that automatically receives the bill data for all users, but selects only that portion of the bill data belonging to that particular user. The user may then use the PAID (which has a keyboard) to send instructions to the Information Center (the third component) which then directs a transfer of funds to pay the bill. The user may also use the PAID to notify the supplier of a change of address.

Databurst, on the other hand, describes the '084 patent in broader terms and denies that the patent is a "push" device. According to Databurst, the '084 patent relates to "an apparatus that delivers, receives, and facilitates payment of a bill." (Databurst Mot. at 3.) Databurst agrees that there are three components, but describes them as follows: (1) equipment that prepares and transmits billing information; (2) a telecommunications system; (3) a PAID at the location of the user which receives the billing information and allows a user to deliver an order to make payment of an electronic bill. According to Databurst, the '084 patent would cover a system where a supplier sends only an individual user's billing information to the user.

Databurst argues that the claims of the '084 patent encompass an apparatus (such as Checkfree's) that utilizes the Internet to deliver billing information for a single user who can then authorize payment. On the other hand, Checkfree argues that such an apparatus would fall outside the scope of the '084 patent because the '084 patent only contemplates the telecommunication of billing data for *all* users and cannot cover a system that transmits bill payment information for only a single user.

2

**Claim Construction Principles**

An infringement analysis is a two-step process. The first step is determining the meaning and scope of the patent claims allegedly infringed, also known as claim construction. *Mahurkar v. Arrow Int'l, Inc.*, 160 F. Supp. 2d 927, 932 (N.D. Ill. 2001) (citing *Markman*, 52 F.3d at 976). Courts must construe the claims as a matter of law before turning to the second step, the factual application of those claims to the accused products. *Id.*

The American patent system attempts to both secure the patentee's rights and to put others on notice of what the patentee has removed from the public domain for the life of the patent. *Arachnid, Inc. v. Merit Ind., Inc.*, 201 F. Supp. 2d 883, 887 (N.D. Ill. 2002). In light of these goals, the court first looks to the language of the patent itself, including the claims, the specification, and the prosecution history, as the primary source for construing patent claims. *Id.* The language of the claim defines the scope and meaning of that claim. *York Products, Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996). The language of the claims is to be given its ordinary and accustomed meaning. *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). There are two instances in which the court may give a claim term a meaning outside of the ordinary one. When the patentee has chosen to be his own lexicographer, the court may allow a special definition so long as it is clearly stated in the patent specification or history. *Id.* at 990; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The second occasion arises when the terms used by the patentee "so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained from the language used." *Zebco*, 175 F.3d at 990.

Second, the court looks to the patent specification, which must contain a written description

3

of the invention that is clear and complete enough to enable those of ordinary skill in the art to make and use it. *Vitronics*, 90 F.3d at 1582. The specification is "always highly relevant" and is the "single best guide to the meaning" of a disputed term. *Id.* All claims must be read in view of the specification, which acts as a sort of dictionary to explain the invention and may also help to define the terms used in the claims. *Markman*, 52 F.3d at 979.

Third, the court may also consider the prosecution history of the patent, which contains the complete record of the proceedings before the Patent and Trademark Office, including any express representations made by the patentee regarding the scope of the claims. *Vitronics*, 90 F.3d at 1582. Often significant in determining the scope of a claim, the prosecution history can and should be used to understand the language used in the claim. *Id.* Such history may include an examination of the prior art, which may give guidance as to what the patent does and does not cover. *Id.* at 1583.

Finally, extrinsic evidence, such as expert and inventor testimony, dictionaries and learned treatises, may be considered only to assist the court in understanding the patent, not to vary or contradict the terms of the claims. *Markman*, 52 F.3d at 980-81. Extrinsic evidence should be relied upon only if the analysis of intrinsic evidence fails to resolve an ambiguity in the disputed claim term. *Vitronics*, 90 F.3d at 1584. Judges are free to consult dictionaries at any time to better understand the underlying technology, and may rely on dictionary definitions as the ordinary and accustomed meaning of a term, as long as that definition does not contradict any definition found in the patent itself. *Id.* at 1584, n.6. A court may rely on prior art to aid in the court's understanding and to demonstrate how a disputed term is used by those skilled in the art. *Id.* at 1584. Opinion testimony of experts and the inventor should be treated with "utmost caution" and may only be relied upon if the patent documents are insufficient to enable the court to construe the disputed claims

4

terms, which is "rare[], if ever." *Id.* at 1584-85.

**Means-Plus-Function Format**

Both parties agree that each of the disputed claims is a means-plus-function construction and should be construed pursuant to 35 U.S.C. § 112, ¶ 6. Pursuant to that section, a claim element may be "expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112, ¶ 6. Claim elements written in a "means-plus-function" format are construed to cover the corresponding structures described in the specification, and equivalents thereof. *Id.* In construing a means-plus-function element, the court must identify the function portion of the element and construe any disputed terms in the function language. Next, the court must identify the corresponding structure(s) disclosed in the specification linked or associated with that function. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998). To determine the claimed function, the court must construe the specific terms in the claim. *Id.* at 1308.

**Claim Interpretation**

The elements of the '084 patent requiring construction by the court are found in claims 1(a), 1(c), 1(d), 1(h), 8(a) and 8(d). However, the court finds the construction of claim 1(c) to be determinative in this case. Therefore, the court need not construe the remaining claims.

The language in claim 1(c) reads: "means for telecommunicating the read billing information to a user." Because it is undisputed that this claim is a means-plus-function construction, the court will construe it pursuant to 35 U.S.C. § 112, ¶ 6. The parties' dispute over claim 1(c) turns on the meaning of the phrase "billing information" as it is used in that claim. The question of whether "billing information" refers to all users, or only one user, is determinative because the alleged

infringement by Checkfree concerns a bill payment system in which a supplier telecommunicates a single user's bill information. Checkfree argues that "billing information" is synonymous with "billing data" and, therefore, its product cannot infringe the '084 patent. Databurst, on the other hand, argues that "billing information" refers to information for only one particular user.

Checkfree argues that in claim 1(c) "billing information" is synonymous with the term "billing data," and, thus, it should be construed to mean "information regarding bills for all users." (Checkfree Mot. at 21.) Specifically, Checkfree contends that the term "billing information" represents the bills for all users, including (1) information about the transactions that are to be billed to each user; and (2) identification information for each user. Recognizing that the pertinent specification does not define the phrase "billing information" but does define "billing data," Checkfree states that "billing data for the customers" includes "customer identification information and information about the transactions that are to be billed to the customer." Checkfree asserts without explanation that the wording of the specification supports the notion that "billing information" is synonymous with "billing data" and therefore includes the billing data for all users. In addition, Checkfree argues that the prosecution history supports its argument that "billing information" is the same as "billing data" as used in the specification. Checkfree claims that the patentee used the two terms interchangeably, as evidenced by the patentee's amendment to claim 1 where "billing data" was replaced with "billing information." Finally, Checkfree relies on inventor testimony to support the correlation between "billing information" and "billing data." In light of this construction, Checkfree maintains that the limitation in claim 1(c) cannot be met by a device that telecommunicates only an individual user's bills.

Databurst argues that claim 1(c) should be construed as a "means-plus-function limitation covering modems 26 and 30, phone lines 32, modem 46 and equivalents thereof, which communicate billing information at a distance as by telephone, radio, optical beams and the like." (Databurst Mot. at 17.) Databurst argues that based on the language of the specification, "billing data" is plural, while "billing information" is the specific unit of information for one customer. Specifically, Databurst alleges that "billing information" is defined in the specification as "customer identification information and information about transactions that are to be billed to the customer." (Databurst Mot. at 18.)

The court must now determine the meaning of the phrase "billing information," as used in claim 1(c) to describe what is telecommunicated from the supplier (such as a credit card company) to the individual user. First of all, contrary to Databurst's contention, the term "billing information" is not defined in the specification or anywhere in the patent. The specification states that a "block 10 contains billing data for the customers." ('084 patent, col. 2, ll. 38-39.) It is undisputed that the term "billing data" refers to the billing data for all customers. The next sentences reads: "<u>This</u> includes customer identification information and information about the transactions that are to be billed to the customer." (*Id.* at ll. 39-40) (emphasis added). The pronoun "this" refers to the antecedent "block 10" in the preceding sentence. Reading the two sentences together, block 10 (containing "billing data") includes customer identification information and information about the transactions that are to be billed to the customer.[1] Therefore, that section of the specification relied upon by Databurst refers to "billing data" and cannot be read as a definition for "billing

---

[1] Although not necessary to the court's construction, the court notes that the testimony of the inventor of the '084 patent acknowledged that "billing information" was the same as "billing data" at the "block 10" stage. (Checkfree Mot., Ex. D, Linse Dep. at 177-78.)

information." Further, the ordinary and accustomed meaning of "information" does not provide this court with any guidance as "information" may be either singular or plural. *See Webster's Ninth New College Dictionary* 620 (9th ed. 1985) (defining "information" as "the communication or reception of knowledge or intelligence").

The court next turns to the specification more generally for guidance. "Billing data" is used to describe what is broadcast from the supplier to the user. By tracing "billing data" as it travels through different blocks in the specification, "billing data" is consistently referenced until the term "billing information" appears in lines 14 and 20 in column 3. In a nutshell, "billing data" (which both parties agree refers to the data for all customers) is first supplied to block 10, read by a tape reader in block 12, temporarily stored at block 14 or 16, scrambled, encoded or faxed by block 20, 22, or 24, output to a modem at block 26, received by another modem at block 30, transmitted by block 32, 34, or 38, received by block 44 or 46, digitally decoded by block 50 and decoded according to a user's address at block 52. Up to this point, nothing has occurred in the process to change the content or substance of the "billing data," and, therefore, the court reads "billing information" in lines 14 and 20 in column 3 to refer to the billing data for all customers. Therefore, "billing information" in both lines 14 and 20 refers to what was broadcast by the supplier to the user, *i.e.* billing data. This supports a construction that "billing information" includes the billing data for all customers.

There is, however, some further ambiguity and inconsistency in the use of the phrase "billing information" that occurs later in the specification's description. After the address decoder at block 52 determines if a bill is coming in for a particular user, the "billing information is stored in memory in the message storage unit." ('084 patent, col. 3, ll. 44-45.) Now, at this point in the process, the

8

billing data has been filtered and "billing information" refers to the individual user's bill. Use of "billing information" after the filtering process, (*id.*), must have a different meaning from "billing information" before the sorting process, (*id.* at ll. 14, 20). "Billing information," therefore, as used in the specification, has two distinct meanings.

In order to determine whether "billing information" as used in claim 1(c) means the billing data for all users or for only one user, the court now looks to the prosecution history. The inventors submitted their patent application on August 29, 1988. (Checkfree Mot., Ex. C, Tab 1 at 1.) As originally drafted, claim 1(c) used the term "billing data," not "billing information." (*Id.* at Tab 1 at 11.) It appears that an examiner marked corrections and comments on their application. (*Id.* at Tab 1 at 2-14.) On pages 11 and 12, certain corrections to claim 1 are made; the word "data" was replaced by "information." (*Id.* at Tab 1 at 11-12.) Significantly, in the claim as originally drafted, the term "billing data" was consistently used *prior* to the filtering at the address decoder, while "billing information" was consistently used *after* the address decoder. (*Id.* at Tab 1 at 11.) In the examiner's action dated June 20, 1989, the examiner did not explain his reason for replacing "data" with "information." (*Id.* at Tab 2 at 1.) In response, the inventors amended claim 1 by changing the word "data" to "information." (*Id.* at Tab 4 at 2.) Both the claim as originally drafted and the amendment from "data" to "information" supports a construction that "billing information" as used in claim 1(c) means the billing data for all customers.

However, use of the phrase "billing data" in the specification was not changed to "billing information" as it was in the recitation of claim 1. During a lengthy prosecution history, patentees sometimes fail to update the specification language as they amend the claims. *Eolas Technologies, Inc. v. Microsoft Corp.*, 2000 WL 1898853, *15 (N.D. Ill. 2000). It seems likely that inadvertence

on the part of the patentees explains the inconsistent use of the phrase "billing information." Further, the court notes that a construction in which the supplier sends to the user only the individual user's billing information does not withstand scrutiny in light of the filtering process included within the patent. The patent contemplates that data would be received by the user, run through an address decoder, and then an individual user's bill would be delivered into the PAID. If the supplier sends the user's receiver only the individual user's bill, there would be no need to have any filtering mechanism.

**Conclusion**

Based on the above, the court finds that the term "billing information" in claim 1(c) includes the billing data for all customers, and includes for each user: (1) information about the transactions that are to be billed to that user, and (2) identification information for that user. This limitation would not cover any equipment that telecommunicates only an individual user's bill(s) from the supplier to the user.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

Dated: March 17, 2003